**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MAREI VON SAHER,
　　　　　　*Plaintiff-Appellant*,

　　　　v.

NORTON SIMON MUSEUM OF ART AT
PASADENA; NORTON SIMON ART
FOUNDATION,
　　　　　　*Defendants-Appellees.*

No. 16-56308

D.C. No.
2:07-cv-02866-
JFW-SS

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted February 14, 2018
Pasadena, California

Filed July 30, 2018

Before: M. Margaret McKeown and Kim McLane
Wardlaw, Circuit Judges, and James Donato,[*] District
Judge.

---

[*] The Honorable James Donato, United States District Judge for the Northern District of California, sitting by designation.

Opinion by Judge McKeown;
Concurrence by Judge Wardlaw

## SUMMARY**

### Act of State Doctrine

The panel affirmed the district court's summary judgment in favor of the Norton Simon Museum of Art at Pasadena in an action by Marei von Saher to recover two oil paintings that were among a group of artworks taken by Nazis in a forced sale from her father-in-law during World War II.

Following the war, the Allied Forces returned the paintings to the Dutch government. In 1966, the Dutch government sold the paintings to George Stroganoff-Sherbatoff, who in turn sold the paintings to the Norton Simon Museum in 1971. In the late 1990s, von Saher sought to recover the paintings from the Dutch Government. The Dutch Court of Appeals denied von Saher's petition for restoration of rights in the paintings.

The panel applied the act of state doctrine, which requires that the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid. The panel held that von Saher's theory would require the court to invalidate official acts of the Dutch government. Specifically, for van Saher to succeed: the Dutch government's conveyance of the

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

paintings to Stroganoff would need to be deemed legally inoperative; and the panel would need to disregard both the Dutch government's 1999 decision not to restore von Saher's rights to the paintings, and its later statement that her claim to the paintings had "been settled." The panel concluded that the Dutch government's transfer of the paintings and its later decisions about the conveyance were "sovereign acts" requiring application of the act of state doctrine.

The panel held that exceptions to the act of state doctrine did not apply. The panel also held that the policies underlying the act of state doctrine supported its application in this case.

Concurring, Judge Wardlaw agreed that the Dutch government's conveyance to Stroganoff was an official act of the Netherlands. Judge Wardlaw wrote that the case should not have been litigated through the summary judgment stage, however, because the district court correctly dismissed the case on preemption grounds in March 2012.

### COUNSEL

Lawrence M. Kaye (argued), Howard N. Spiegler, Frank K. Lord IV, and Darlene B. Fairman, Herrick Feinstein LLP, New York, New York, for Plaintiff-Appellant.

Fred Anthony Rowley Jr. (argued), Justin P. Raphael, Eric P. Tuttle, Mark R. Yohalem, Luis Li, and Ronald L. Olson, Munger Tolles & Olson LLP, Los Angeles, California, for Defendants-Appellees.

Stanley W. Levy, Benjamin G. Shatz, and Connie Lam, Manatt Phelps & Phillips LLP, Los Angeles, California; Michael Bazyler, Dale E. Fowler School of Law, Chapman University, Orange, California; for Amici Curiae The 1939 Society, Bet Tzedek, and Jewish Historical Museum.

Owen C. Pell and Lynn Kaiser, White & Case LLP, New York, New York; Agnes Peresztegi, Of Counsel, Soffer Avocats, Paris, France; for Amicus Curiae Commission for Art Recovery.

Susan J. Kohlmann, Irene M. Ten Cate, and Ava U. McAlpin, Jenner & Block LLP, New York, New York, for Amicus Curiae Professor Leonard F.M. Besselink.

Thomas R. Kline and L. Eden Burgess, Cultural Heritage Partners PLLC, Washington, D.C., for Amici Curiae Members of Congress E. Engel and J. Nadler and Former Members of Congress M. Levine and R. Wexler.

**OPINION**

McKEOWN, Circuit Judge:

Hanging in the balance are Renaissance masterpieces that have been on display in California for nearly half a century. The dispute over their ownership, however, dates back to World War II, when the Nazis invaded the Netherlands.

Marei von Saher ("von Saher") seeks to recover two oil paintings that were among a group of artworks taken by Nazis in a forced sale from her father-in-law. Following the war, the Allied Forces returned the paintings to the Dutch government, which established a claims process for recouping Nazi-looted property. Von Saher's family, on the advice of counsel, chose not to file a claim on the paintings within the allotted time. In 1966, the Dutch government sold the two paintings to George Stroganoff-Sherbatoff ("Stroganoff") after Stroganoff filed a restitution claim alleging that he was the rightful owner. Stroganoff then sold the paintings in 1971 to the Norton Simon Art Foundation and the Norton Simon Museum of Art at Pasadena (collectively, "the Museum"). The paintings have been on display ever since.

In the late 1990s, von Saher tried to recover from the Dutch government all paintings included in the forced sale. The Dutch Court of Appeals issued a final decision, denying von Saher's petition for restoration of rights in the paintings. A few years later, the Dutch government nonetheless decided to return to von Saher the paintings that were still in its possession, but did not return the two paintings it had sold to Stroganoff because they were in California. Von Saher sued the Museum in federal court soon after.

This marks the third time that we have considered von Saher's case, having most recently remanded for further factual development. The district court granted summary judgment to the Museum, concluding that the Netherlands possessed good title under Dutch law when it sold the paintings to Stroganoff.

We affirm, but not under Dutch law. Because the act of state doctrine deems valid the Dutch government's conveyance to Stroganoff, the Museum has good title. Holding otherwise would require us to nullify three official acts of the Dutch government—a result the doctrine was designed to avoid.

## Background

### THE PAINTINGS

At the center of this controversy are two Renaissance masterworks— "Adam" and "Eve"—painted by Lucas Cranach the Elder ("the paintings" or "the Cranachs"). In 1931, Dutch art dealer Jacques Goudstikker purchased the Cranachs from the Soviet Union at an auction in Berlin called "the Stroganoff Collection."[1] The paintings became the property of the art dealership in which Goudstikker was principal shareholder ("the Goudstikker Firm" or "the Firm").

---

[1] The district court found that the Stroganoff family "never owned" the Cranachs, a fact contested by the Museum and muddied by the record evidence. While we need not determine whether the Stroganoff family once owned the Cranachs, the evidence that it even possibly owned the paintings bears on whether Stroganoff's assertion of ownership to the Dutch government in the 1960s presented a colorable restitution claim, and hence prompted an act of state.

In May 1940, as the Nazis invaded the Netherlands, Goudstikker and his family fled to South America, fearing persecution and leaving behind his gallery of over 1,200 artworks.  Tragically, Goudstikker died on the boat trip.  His wife Desi, who acquired Goudstikker's shares in the Firm, maintained a blackbook listing all the paintings in the gallery, including the Cranachs.

After Goudstikker's death, Nazi Reichsmarschall Hermann Göring and his cohort Alois Miedl "bought" the Goudstikker Firm and its assets through a series of involuntary written agreements with a remaining employee of the Firm.[2]  These "forced sales" proceeded in two parts: Miedl acquired the Firm, its showroom, some of its paintings, and the family's villa and castle for 550,000 guilders ("the Miedl transaction").  Göring purchased other artworks, including the Cranachs, for two million guilders— the equivalent of over 20 million current U.S. dollars ("the Göring transaction").

After World War II, the Allied Forces in Germany recovered much of the art collection taken from Goudstikker by Göring, including the Cranachs.  The Allies turned the paintings over to the Dutch government in 1946.

### THE DUTCH RESTITUTION SYSTEM

During and after the war, the Dutch government created systems of restitution and reparations for losses incurred by its citizens at the hands of the Nazis.  The pillars of those

---

[2] At various times until the Netherlands and the Firm reached a settlement agreement in 1952, certain Dutch authorities took the position that the Göring and Miedl transactions were voluntary.  That idea has long since been dispelled, and the forced nature of the transaction is uncontested by the parties.

systems were established in a series of royal decrees. We provide a sketch of those decrees because they bear on our decision to apply the act of state doctrine.

### Royal Decree A6 and the 1947 CORVO Decision

The Dutch government enacted Royal Decree A6 in June 1940, shortly after the Nazis invaded the Netherlands. The decree prohibited and automatically nullified agreements with the enemy. A6 vested authority in a special committee (*Commissie Rechtsverkeer in Oorlogstijd* or "CORVO") to "revoke the invalidity" of such transactions "by declaring the agreement or act still effective."

In 1947, CORVO revoked the automatic invalidity of agreements with the enemy for property that was recuperated to the Netherlands by the Allies. As CORVO explained, A6 was enacted to protect Dutch property interests from the Nazis. But once property was returned to the Dutch government, "the initial interest of such nullity is eliminated." After property was returned to the Netherlands, the original Dutch owners could petition for a restoration of rights in the property under Royal Decree E100.

### Royal Decree E100

The Dutch government enacted Royal Decree E100 in 1944. The decree established a Council for Restoration of Rights ("the Council"), with broad and exclusive authority to declare null and void, modify, or revive "any legal relations that originated or were modified during enemy occupation of the [Netherlands]."

The Council had the exclusive power to order the return of property and to restore property rights to the original Dutch owners. The Council consisted of several

departments, including a Judicial Division.  The restitution decisions of the other departments were appealable to the Judicial Division, whose judgments were final and non-appealable, and carried the force of a court judgment. Petitioners could bring claims for restoration of rights directly to the Judicial Division, or bring claims to other departments and appeal adverse decisions to the Judicial Division.  Upon enactment of E100, the Council supplanted the Dutch common-law courts as the venue for adjudging wartime property rights, as those courts became "incompetent to hear and decide on claims or requests that the Council is competent to handle by virtue of this Decree."

The Dutch government set a July 1, 1951 deadline for claimants to file E100 restoration-of-rights petitions with the Council.  After that deadline, the Council could still order restoration of rights of its own accord, but claimants were no longer entitled to demand restitution.  Usually, if an original owner received money or other consideration in exchange for property taken by the Nazis, the original owner was required to return the sale price to the Dutch government in order to obtain restitution.

Decree E100 also authorized the Council to dispose of property of "unknown owners":  "If the owner has not come forward within a period to be further determined by Us, items that have not yet been sold shall be sold . . . ."  The Dutch government set the deadline for owners "com[ing] forward" at September 30, 1950.

**Royal Decree E133**

The Dutch government enacted Royal Decree E133 in 1944 to expropriate enemy assets in order to compensate the Netherlands for losses it suffered during World War II. Article 3 of E133 provided that within the Netherlands, all

"[p]roperty, belonging to an enemy state or to an enemy national, automatically passes in ownership to the State with the entering into force of this decree . . . ."  The expropriation of enemy property was automatic and continued until July 1951, when the Netherlands ceased hostilities with Germany.

### VON SAHER'S FAMILY DECLINED TO SEEK RESTORATION OF RIGHTS IN THE CRANACHS

After the war, the Dutch government seized what previously had been the Goudstikker Firm (now the Miedl Firm) as an enemy asset and appointed new administrators. Goudstikker's widow (and von Saher's mother-in-law) Desi returned to the Netherlands to pursue restitution.

With Desi and new leadership in place, on the strategic advice of its business advisers and legal counsel, the Goudstikker Firm decided not to pursue restitution for the Göring transaction.  Specifically, the Firm believed that seeking restitution would have "left [the business] with a large number of works of art that are difficult to sell"; "led to the revival of an art dealership with all pertinent negative consequences," including "find[ing] a suitable person to run such a business"; and "led to a considerable reduction in the [business's] liquid assets."  The Firm's attorney Max Meyer laid out his advice in a memorandum to the Firm.  A.E.D. von Saher, who later married Desi, confirmed that "the shareholders still considered to also conduct legal redress with respect to the Goering contract.  Mr. Meyer and Mr. Lemberger strongly advised against this."

In 1949, Meyer wrote to the Dutch agency holding the Göring artworks to express that the Firm was releasing any claim it had to those pieces: "I would also like to take this opportunity to confirm that the Art Trade J. Goudstikker

LLC waives the right to file for restoration of rights regarding goods acquired by Goering . . . ."    The memorandum accompanying that letter showed that Meyer was aware that he could have filed a claim to restore rights in both the Göring and Miedl transactions, because they would have been voidable under E100.    In proceedings before the modern Dutch Restitution Committee, Marei von Saher conceded that "Goudstikker made a deliberate and well-considered decision not to seek restoration of rights with respect to the goods that had been acquired by Göring."

By contrast, the Firm decided to pursue restitution for the Miedl transaction, including other artworks and real estate. Just shy of the July 1, 1951 E100 deadline, the Firm filed with the Council a petition for restoration of rights concerning the Miedl transaction only.    In August 1952, the Firm and the Dutch government settled the Firm's restitution claims.[3]

### The Dutch Government Sold the Cranachs to Stroganoff, Who Sold Them to the Museum

In the 1960s, Stroganoff petitioned the Dutch government, asserting that he was the rightful owner of the Cranachs because the Soviet government had stolen them from him.    In 1966, the parties reached an amicable settlement in which Stroganoff bought "back" the paintings from the Netherlands in exchange for dropping his restitution claims.

---

[3] The parties dispute whether the 1952 settlement released claims involving *both* the Miedl and the Göring transactions.  The district court did not make a factual finding on the issue, and the answer does not affect our resolution of this appeal.

Through his agent, in 1971 Stroganoff sold the Cranachs to the Museum for $800,000.  The Cranachs have been on public display since that time.

### VON SAHER PURSUED RESTITUTION FROM THE DUTCH GOVERNMENT

In the 1990s, Marei von Saher—the only living heir of Jacques and Desi Goudstikker—began seeking restitution for artworks that the Firm "sold" to Göring. As part of those efforts, von Saher filed an E100 petition for restoration of rights in the Dutch Court of Appeals (the legal successor to the Council for Restoration of Rights) for all paintings acquired by Göring, including the Cranachs.  The Court of Appeals denied the petition, concluding that the Firm "made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Göring transaction."  Von Saher appeared to be at a dead end.

But in 2001, the Netherlands reevaluated its "bureaucratic" restitution process, transforming its mission from a "purely legal approach" to "a more moral policy approach."  In doing so, the Dutch government created a new Restitution Committee, to advise the State Secretary of Education, Culture and Science on restitution claims for property that was still in the possession of the Dutch government.  Embracing the change in forum, von Saher petitioned the State Secretary for over 200 artworks that the Firm "sold" to Göring and that were still held by the Dutch government.  Her claim did not include the Cranachs.

After receiving a non-binding recommendation from the Restitution Committee, the State Secretary ruled that von Saher's claim for the artworks in the Göring transaction had already been "settled" in the 1950s and in the 1999 Dutch Court of Appeals decision.  The State Secretary nonetheless

decided to return to von Saher all the paintings from the Göring transaction still in possession of the Dutch government.  The State Secretary expressly stated that the decision to return the other paintings did not concern the Cranachs.

### *VON SAHER I*

Out of options with the Dutch government, in 2007 von Saher filed a federal diversity action against the Museum in the Central District of California, seeking to recover the paintings.  The suit alleged state-law claims for replevin, conversion, damages under California Penal Code § 496, quiet title, and declaratory relief.  The action alleged timeliness under a California civil-procedure statute that allowed the rightful owners of confiscated Holocaust-era artwork to recover their items from museums or galleries and set a filing deadline of December 31, 2010.  Cal. Civ. Proc. Code § 354.3(b), (c).

The district court dismissed the action, finding von Saher's claims untimely and concluding that California's special statute of limitations was unconstitutional.  We affirmed, holding the California statute unconstitutional on field preemption grounds as the state was attempting to engage in foreign affairs.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 965–68 (9th Cir. 2010) ("*Von Saher I*").  But we provided von Saher leave to amend her complaint in case she could allege that she lacked notice such that her claims were timely under California's generic statute of limitations for property actions.  *Id.* at 968–70; *see* Cal. Civ. Proc. Code § 338.  Von Saher's petition for certiorari to the U.S. Supreme Court was denied.  564 U.S. 1037 (2011).

## *VON SAHER II*

Soon after our decision in *Von Saher I*, the California legislature amended its statute of limitations for actions "for the specific recovery of a work of fine art brought against a museum, . . . in the case of an unlawful taking or theft . . . within six years of the actual discovery by the claimant or his or her agent."   Cal. Civ. Proc. Code § 338.   The legislature made the amendment retroactive and von Saher amended her complaint accordingly.

The Museum again moved to dismiss, this time arguing that von Saher's claims conflicted with federal foreign policy.  The district court granted the motion.  On appeal, we reversed and remanded, over a dissent from Judge Wardlaw. *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712 (9th Cir. 2014) ("*Von Saher II*").

The panel majority held that von Saher's state-law claims did not conflict with federal policy concerning Nazi-stolen art "because the Cranachs were never subject to postwar internal restitution proceedings in the Netherlands." *Id.* at 721.  More specifically, von Saher's complaint alleged that "(1) Desi chose not to participate in the initial postwar restitution process, (2) the Dutch government transferred the Cranachs to Stroganoff before Desi or her heirs could make another claim and (3) Stroganoff's claim likely was not one of internal restitution."  *Id.* at 723.[4]

The panel majority refused to afford "serious weight" to an amicus brief filed in the Supreme Court by the U.S.

---

[4] Importantly, the decision in *Von Saher II* was at the motion-to-dismiss stage, and so von Saher's allegations were assumed to be true. 754 F.3d at 714.  As analyzed below, the record on remand does not bear out these allegations.

Department of State and the Office of the Solicitor General in *Von Saher I.  Id.* at 724.  The panel noted that the brief went "beyond explaining federal foreign policy and appear[ed] to make factual determinations." *Id.*  Namely, the brief suggested that the Cranachs had "been subject (or potentially subject to) bona fide restitution proceedings in the Netherlands," which contradicted the allegations in von Saher's amended complaint.  *Id.*

Although the panel posited that this was "a dispute between private parties," it was "mindful that the litigation of this case may implicate the act of state doctrine." *Id.* at 725.  The case was remanded for further factual development and to determine whether the doctrine applies to von Saher's claims.  *Id.* at 727.

Judge Wardlaw dissented.  In her view, the United States, through the amicus brief submitted by the Solicitor General's Office and the State Department, had articulated the foreign policy applicable to conflicts like this one.  *Id.* at 728 (Wardlaw, J., dissenting).  The brief conveyed that "World War II property claims may not be litigated in U.S. courts if the property was 'subject' or '*potentially subject*' to an adequate internal restitution process in its country of origin." *Id.*  The brief further explained that the paintings at issue in this appeal "have already been the subject of both external and internal restitution proceedings, including recent proceedings by the Netherlands." *Id.*  Those proceedings were "bona fide," according to the brief, and so "their finality must be respected." *Id.*  Judge Wardlaw determined that "Von Saher's attempt to recover the Cranachs in U.S. courts directly thwarts the central objective of U.S. foreign policy in this area: to avoid entanglement in ownership disputes over externally restituted property if the victim had an adequate opportunity to recover it in the

country of origin." *Id.* at 729. Although Judge Wardlaw did not reach the issue because she concluded the case should be resolved on preemption grounds, she noted that the act of state doctrine may apply. *Id.* at 730 n.2.

The Supreme Court denied the Museum's certiorari petition. 135 S. Ct. 1158 (2015).

**SUMMARY JUDGMENT TO THE MUSEUM ON REMAND**

On remand, after denying the Museum's motion to dismiss on timeliness grounds, the district court conducted over a year of discovery and considered the parties' cross-motions for summary judgment. Applying Dutch law, the district court granted summary judgment to the Museum, concluding that:

> (1) because CORVO revoked the automatic invalidity of the Göring transaction in 1947, that transaction was "effective" and the Cranachs were considered to be the property of Göring; (2) because Göring was an "enemy" within the meaning of Royal Decree E133, his property located in the Netherlands, including the Cranachs, automatically passed in ownership to the Dutch State pursuant to Article 3 of Royal Decree E133; (3) unless and until the Council annulled the Göring transaction under Royal Decree E100, the Cranachs remained the property of the Dutch State; and (4) because the Göring transaction was never annulled under Royal Decree E100, the Dutch State owned the Cranachs when it transferred the paintings to Stroganoff in 1966.

Hence, the Dutch government possessed good title to the paintings when it sold them to Stroganoff, who then conveyed good title to the Museum.

**Analysis**

We review de novo summary judgment rulings and questions of foreign law, including whether to apply the act of state doctrine.  *See Brunozzi v. Cable Commc'ns, Inc.*, 851 F.3d 990, 995 (9th Cir. 2017); *De Fontbrune v. Wofsy*, 838 F.3d 992, 1000 (9th Cir. 2016); *Liu v. Republic of China*, 892 F.2d 1419, 1424 (9th Cir. 1989).

The act of state doctrine is a "rule of decision" requiring that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid."  *W.S. Kirkpatrick Co. v. Environ. Tectonics Corp., Int'l*, 493 U.S. 400, 405, 409 (1990); *see generally* Born and Rutledge, *International Civil Litigation in United States Courts* 751–55 (2007).  "The doctrine reflects the concern that the judiciary, by questioning the validity of sovereign acts taken by foreign states, may interfere with the executive branch's conduct of foreign policy."  *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1089 (9th Cir. 2009).  We apply the doctrine only when we are "require[d] . . . to declare invalid, and thus ineffective . . . , the official act of a foreign sovereign."  *W.S. Kirkpatrick*, 493 U.S. at 405.  Hence, we apply the doctrine here, because "the relief sought" by von Saher would necessitate our "declar[ing] invalid" at least three "official act[s] of" the Dutch government "performed within its own territory."  *Id.*

### I. VON SAHER'S THEORY WOULD REQUIRE THE COURT TO INVALIDATE OFFICIAL ACTS OF THE DUTCH GOVERNMENT

Von Saher's recovery hinges on whether she—not the Museum—holds good title to the paintings. The Museum's defense, in turn, depends on its having received good title from Stroganoff, who forfeited his own restitution claim to the paintings when he bought them from the Netherlands in 1966. It is therefore a necessary condition of von Saher's success that the Dutch government's conveyance of the paintings to Stroganoff be deemed legally inoperative. For von Saher to succeed, we would also need to disregard both the Dutch government's 1999 decision not to restore von Saher's rights in the Cranachs and its later statement that her claim to the Cranachs had been "settled." Because it is "essential to" von Saher's cause of action that these three official actions of the Dutch government be held invalid, the act of state doctrine applies. *See Marinduque*, 582 F.3d at 1085.[5] We examine these three acts in turn.

### A. THE DUTCH GOVERNMENT'S CONVEYANCE TO STROGANOFF

As we acknowledged in *Von Saher II*, the act of state doctrine may apply to quiet title actions like von Saher's that would require a court to nullify a foreign nation's conveyances. 754 F.3d at 725–26 (citing *Oetjen v. Central Leather Co.*, 246 U.S. 297, 303–04 (1918); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)). What matters is "whether the conveyance . . . constituted an official act of

---

[5] Because the act of state doctrine provides a rule of decision that deems valid the Stroganoff conveyance, we do not conduct a choice-of-law analysis.

[the] sovereign." *Von Saher II*, 754 F.3d at 726. There is little doubt that the Dutch government's conveyance to Stroganoff qualifies as an official act of the Netherlands.

We view the conveyance not as a one-off commercial sale, but as the product of the Dutch government's sovereign internal restitution process.[6]     Under that process, the Netherlands passed Royal Decrees E133, to expropriate enemy property, and E100, to administer a system through which Dutch nationals filed claims to restore title to lost or looted artworks. Whatever the exact legal effect of those decrees—and irrespective of whether the district court correctly interpreted their meaning under Dutch law—we cannot avoid the conclusion that the post-war Dutch system adjudicated property rights by expropriating certain items from the Nazis and restoring rights to dispossessed Dutch citizens.[7]     No one disputes, for example, that the Firm successfully availed itself of the post-war system by petitioning for restoration of rights in the artworks it had sold to Miedl.

---

[6] The post-war governmental processes here contrast sharply with, for example, an employee of a city museum purchasing artworks on the open market like any art dealer could do. *See Malewicz v. City of Amsterdam*, 517 F. Supp. 2d 322, 339 (D.D.C. 2007) (finding that the act of state doctrine does not apply in such a case because "there was nothing sovereign about the City's acquisition of the . . . paintings, other than that it was performed by a sovereign entity.").

[7] The Museum submitted a compendium of post-war cases in which the Council for Restoration of Rights held that, under E133, the Dutch government expropriated ships and artwork that Dutch nationals had sold to the Germans during the war but were later recuperated. Although we do not rely on these cases for their substantive holdings, they underscore that the post-war Dutch system fixed rights in Nazi-looted property pursuant to official governmental policy—not as purely commercial acts.

Expropriation of private property is a uniquely sovereign act. *See, e.g.*, *Oetjen*, 246 U.S. at 303 (applying the act of state doctrine to governmental seizures of property); U.S. Const. amend. V.  Whether or not the Netherlands effected an expropriation of the Cranachs under Dutch law, the Dutch government *acted* with authority to convey the paintings after von Saher's predecessors failed to file a claim under E100.  Von Saher's expert conceded that the "Netherlands considered itself the lawful owner of the works sold to Goering" and "acted as the[ir] true owner."  The Dutch government then unquestionably acted as the owner of the paintings by agreeing to convey them to Stroganoff in exchange for his dropping certain restitution claims.  Under the act of state doctrine, "title to the property in this case must be determin[e]d by the result of the action taken by the [Netherlands]." *Ricaud*, 246 U.S. at 309.

In *Von Saher II*, we reasoned that if "the Museum can show that the Netherlands returned the [paintings] to Stroganoff to satisfy some sort of restitution claim, that act could 'constitute a considered policy decision by a government to give effect to its political and public interests . . . and so [would be] . . . the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs.'" 754 F.3d at 726 (citing *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 406–07 (9th Cir. 1983)).

But we see no reason why the Museum cannot likewise show that the Netherlands transferred the paintings to Stroganoff as part of a decades-long "considered policy decision" that was inextricably linked to its rights-restoration proceedings under the royal decrees.  In order to sell to Stroganoff, the Dutch government must have concluded that its proceedings with respect to the Cranachs

and von Saher's family were final.  That interpretation is consistent with the position of von Saher's predecessors, who wrote to the Dutch government that they "waive[d] the right to file for restoration of rights regarding [the Cranachs]," and made a strategic, counseled decision not to file a claim on the Göring transaction in order to keep the substantial sale price.**[8]**  The Dutch government clearly understood the Firm to mean what it said; the government began selling unclaimed artworks shortly after the E100 filing deadline, including other works from the Göring transaction.  The record on remand is clear.

The Museum also made the showing specifically requested in *Von Saher II*—that the conveyance to Stroganoff was a sovereign act made in consideration of a restitution claim.  Stroganoff served a formal petition on the Dutch government, asserting rightful ownership of the Cranachs and a Rembrandt based on a claim that the Soviet government had stolen the artworks.  Stroganoff's writ of summons to the Dutch Ministers asserted that "he [wa]s the owner of these paintings," requested that the Dutch government inform him whether it was "willing to return the paintings," and if not, "to inform [him] of the reasons for [its] refusal."  At the time, the Dutch government "was not in the business of selling national artworks [such as the paintings] considered to be part of the Dutch cultural patrimony."

---

**[8]** Despite that unequivocal waiver, von Saher argues that the Dutch government nonetheless should have kept the paintings on the off chance one of Goudstikker's legal heirs had a change of heart seventy (or more) years later.  That position is based on wishful thinking rather than law or fact and, of course, runs counter to the expectation that post-war restitution systems should "achieve *expeditious*, just and fair outcomes." *Von Saher II*, 754 F.3d at 721 (emphasis added).

After years of negotiations, the Netherlands and Stroganoff decided to "settle the case by means of an amicable arrangement": Stroganoff offered to "buy back" the paintings in exchange for dropping his restitution claims for both the Cranachs and the Rembrandt. The Dutch government entered into the agreement only after carefully considering the public policy ramifications of doing so—the Dutch Minister of Culture initially opposed the proposal because "the two Cranachs are especially important for the Dutch cultural collection." Ultimately, however, the Dutch Minister of Culture considered the settlement to be in "the interest[s] of the country." The Dutch Minister of Finance likewise signed off on the settlement, reinforcing our understanding that the Netherlands entered into the agreement with the careful consideration of high-ranking officials.

Considered holistically, the administration of E100 and E133, the settlement with von Saher's family, and the conveyance of the Cranachs to Stroganoff in consideration of his restitution claim constitute an official act of state that gives effect to the Dutch government's "public interests." *Von Saher II*, 754 F.3d at 726.

### B. THE DUTCH COURT OF APPEALS DECISION NOT TO RESTORE VON SAHER'S RIGHTS TO THE PAINTINGS

Von Saher's theory also would require us to disregard the 1999 Dutch Court of Appeals decision denying the restoration of von Saher's rights in the paintings. This ruling is a second act of state authorizing the transfer of the Cranachs to Stroganoff.

In 1998, von Saher petitioned the Dutch government to surrender all property from the "Goudstikker collection"

over which the State had gained control.  The Dutch State Secretary rejected the request, advising that "[i]n my opinion, directly after the war—even under present standards—the restoration of rights was conducted carefully."

Von Saher then filed an E100 petition for restoration of rights in the Dutch Court of Appeals (the legal successor to the Council for Restoration of Rights).  Von Saher's petition sought relief for all artworks involved in the Göring transaction, including the Cranachs.  The Court of Appeals denied the restoration of von Saher's rights in the paintings, noting that "[f]rom the documents submitted it appears that [the Firm] at the time made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Goring transaction."  The Firm had access to legal advisors and was "free . . . to have submitted an application for [E100] restoration of rights with the Council," but "neglected to do so for well-founded reasons." The Court of Appeals also offered an opinion on the process, concluding that "[t]he Netherlands created an adequately guaranteed procedure for handling applications for the restoration of rights," which was not "in conflict with international law."[9]

Under E100, the Dutch Court of Appeals (succeeding the Council) was the only venue through which von Saher could have received restitution for, and restoration of rights in, the

---

[9] During oral argument, von Saher argued for the first time that the 1999 Dutch Court of Appeals decision is inapposite because it was a "procedural" rather than a "substantive" ruling.  Whatever the import of that distinction, it is inaccurate.  The record explicitly notes that the Court of Appeals weighed the "substantive" evidence and arguments—many of which were presented here—and found "no serious cause to grant ex oficio restoration of rights."

Cranachs.  By administering the exclusive postwar remedial scheme for artwork taken by the Nazis, and refusing von Saher's restoration of rights in the paintings, the Dutch Court of Appeals carried out an official action that is particular to sovereigns.  *See Clayco*, 712 F.2d at 406.  Even if we consider the Court of Appeals decision to be a "foreign court judgment" rather than an agency adjudication, such judgments are treated as acts of state when they "g[i]ve effect to the public interest" of the government.  *See In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005); *accord* Restatement (Second) of Foreign Relations of the United States § 41 cmt. d (1965)) ("A judgment of a court may be an act of state.").  The Dutch ruling provides an additional act of state that deems valid the transfer to Stroganoff.

## C. THE DUTCH GOVERNMENT'S DECISION THAT THE RIGHTS TO THE CRANACHS HAD BEEN "SETTLED"

Based on government activities after the 1999 Dutch Court of Appeals decision, von Saher contends that the act of state doctrine either does not apply or should operate on her behalf.[10]  But rather than aid von Saher, those later activities provide a third official act supporting the legality of the Stroganoff transfer.

Inspired by the 1998 Washington Conference Principles on Nazi-Confiscated Art, the Netherlands departed in 2001 from a "purely legal approach" to restitution in favor of "a

---

[10] In her opening brief, von Saher appeared to argue that the act of state doctrine is applicable and should deem *invalid* the transfer to Stroganoff.  In her reply, she shifted to arguing that the doctrine is "inapplicable."

more moral policy approach." The Dutch government shifted its paradigm at the recommendation of the "Ekkart Committee," which investigated "a great number of post-war claims" and found that one Dutch restitution agency had been "legalistic, bureaucratic, cold and often even callous" in conducting operations.

The new restitution policy was not an official pronouncement that the previous Dutch policy was invalid, however. [11] Nor was the new policy established to re-examine old cases. Far from it, the new policy categorically did not apply to "settled case[s]," defined as those in which "either the claim for restitution resulted in a conscious and deliberate settlement or the claimant expressly renounced his claim for restitution."

To help administer the new policy, in 2001 the Dutch State Secretary of Education, Culture and Science established a "Restitution Committee" charged with considering new restitution applications. The "main task of the Committee" was to advise the State Secretary on "applications for the restitution of items of cultural value of which the original owners involuntarily lost possession due to circumstances directly related to the Nazi regime *and which are currently in the possession of the State of the Netherlands*." (Emphasis added).

With a new system in place, in 2004 von Saher filed a claim for 267 artworks looted by the Nazis from the Goudstikker Gallery that were still in the possession of the Dutch government. Crucially, the claim did not include the Cranachs. Indeed, von Saher could not have filed a

---

[11] Von Saher's expert expressed "no doubt" that the prior restitution policy was administered "in good faith."

successful claim on the Cranachs without the consent of the Museum: the Restitution Committee only has authority to hear disputes involving property not currently possessed by the Netherlands when both the putative original owner and the current possessor request an opinion. The Dutch State Secretary referred the claim to the Restitution Committee, which issued a non-binding recommendation to the Secretary that the Dutch government return certain of the works to von Saher.

Von Saher asserts that the Restitution Committee's non-binding recommendation to the Secretary was itself an act of state—establishing that von Saher's family "did not abandon its rights in the artworks taken by Goring" by failing to file a timely E100 claim. But that interpretation is incorrect. Advisory recommendations that cannot bind the sovereign are not acts of state. *See In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1471 (9th Cir. 1994); *see also Sharon v. Time, Inc.*, 599 F. Supp. 538, 545 (S.D.N.Y. 1984) (concluding that an advisory commission's findings are not acts of state). The Restitution Committee's recommendation and findings were purely advisory. Within the recommendation, the Committee itself stated that its "job" was "to provide advice in such a way that, *if the State Secretary accepts the advice*, a situation is achieved that as closely as possible approximates the former situation" before the forced sales. (Emphasis added).[12]

The Dutch State Secretary then issued a *binding* decision on von Saher's restitution claim that accepted in part and rejected in part the Committee's advice. Importantly, the

---

[12] Nonetheless, the nonbinding recommendations do not support von Saher because they concerned only the specific paintings in her claim, which did not include the Cranachs.

Secretary disavowed the Committee's findings that von Saher's predecessors had not waived their rights to restoration under E100 in the 1950s: "Unlike the Restitution Committee I am of the opinion that in this case it is a matter of restoration of rights which has been settled."   The Secretary concluded that the von Saher claim was "settled" by the 1999 "final decision" of the Court of Appeals, in which the Court found that von Saher's predecessors had consciously foregone their restoration rights.  Because von Saher's case was "settled," her claim was "not included in the current restitution policy."

Although von Saher's was a settled claim that fell outside the new policy, the Secretary nonetheless decided, *ex gratia*, to return to von Saher the over 200 paintings from the Goudstikker Collection that were still in Dutch possession.  The Secretary's action "t[ook] into account the facts and circumstances surrounding the involuntary loss of property and the manner in which the matter was dealt with in the early Fifties."

The Dutch government's decision to return the paintings still in its possession did not disrupt the government's prior, binding acts of state concerning the Cranachs.  The State Secretary for Education, Culture and Science explicitly stated that the Cranachs were "not a part of the claim for which [she] decided on February 6[, 2006] to make the return."   Accordingly, she "refrain[ed] from an opinion regarding the two pieces of art under the restitution policy," and refused to "reverse[]" the prior decisions of the State Secretary of Culture and the Dutch Court of Appeals.  The Secretary's final determination that rights to the Cranachs had been fully "settled" marks the third act of the Dutch state counseling our application of the doctrine.

## II. EXCEPTIONS TO THE ACT OF STATE DOCTRINE DO NOT APPLY

Having concluded that the Dutch government's transfer of the paintings and its later decisions about the conveyance were "sovereign acts," we still "must determine whether any exception to the act of state doctrine applies." *Von Saher II*, 754 F.3d at 726. None does.[13]

### A. "PURELY COMMERCIAL ACTS"

A plurality of the Supreme Court has recognized a potential exception to the act of state doctrine for "purely commercial acts"—*i.e.* where "foreign governments do not exercise powers peculiar to sovereigns," but rather "exercise only those powers that can also be exercised by private citizens." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704–05 (1976). The Supreme Court and our court have never decided whether such an exception exists. *See Von Saher II*, 754 F.3d at 727; *Clayco*, 712 F.2d at 408.

Nor must we decide in this case whether such an exception exists. Expropriation, claims processing, and government restitution schemes are not the province of private citizens. Those are "sovereign policy decision[s]"

---

[13] In addition to the two exceptions we analyze, "the State Department also has restricted the application of th[e] doctrine, freeing courts to 'pass upon the validity of the acts of Nazi officials.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 713–14 (2004) (Breyer, J., concurring) (quoting *Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij*, 210 F.2d 375, 375–76 (2d Cir. 1954) (per curiam)). However, we do not "pass upon the validity of the acts of Nazi officials"; rather, we "pass upon the validity of the acts of" the Dutch government.

befitting sovereign acts. *See Clayco*, 712 F.2d at 406. Because the Dutch government's administration of E100 and E133 and its settlement of Stroganoff's restitution claim are not "purely commercial acts," we do not decide whether such an exception exists. *See id.* at 408.

## B. THE "SECOND HICKENLOOPER AMENDMENT"

The eponymous "Second Hickenlooper Amendment" restricts application of the act of state doctrine, "but only in respect to 'a confiscation or other taking after January 1, 1959.'" *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004) (Scalia, J., concurring) (citing 22 U.S.C. § 2370(e)(2)). In *Von Saher II*, we floated that although the Dutch government kept possession of the paintings after von Saher's predecessors failed to file a claim by 1951, the Dutch government did not transfer the paintings to Stroganoff until 1966, a conveyance that "may constitute a taking or confiscation." 754 F.3d at 727. Yet as the record illustrates, the Dutch government did not take or confiscate anything from von Saher's family in 1966; the family had long since "waive[d] the right to file for restoration of rights" in order to keep the substantial sale price. Any taking, therefore, occurred before the Second Hickenlooper Amendment became effective.

Further, the Amendment bars application of the act of state doctrine only when the governmental action violates "principles of international law." 22 U.S.C. § 2370(e)(2). As von Saher's expert recognized, "international law respects the law as it stood at the time when the decisions were taken." *See* United Nations Int'l Law Comm'n, *Draft Articles on Responsibility of States for Internationally Wrongful Acts, With Commentaries*, art. 13, U.N. Doc. A/56/10 (2001) ("An act of a State does not constitute a breach of an international obligation unless the State is

bound by the obligation in question at the time the act occurs.").

When the Dutch government administered E133 and E100, the United States and other Allies imposed claims-filing deadlines for property taken by the Nazis in occupied German zones. Under these schemes, prospective owners who opted not to file a claim before the deadline were treated as having forfeited their rights to the property. For example, the Court of Restitution Appeals noted that a deadline set in Military Law 59 recognized that "it was imperative to fix a date with finality on which the legal rights of all parties, whether they be individual claimants or successor organizations could be ascertained." *Advisory Opinion No. 1*, 1 Court of Restitution Appeals Reports 489, 492 (Aug. 4, 1950). The Court held that by not filing a timely claim, "[t]he claimant by reason of his default lost his right to restitution under the [provision] when the vesting of the claim in the successor organization took place. He is forever barred from making any claim for the restitution of such property." *Id.*[14] The Dutch system clearly aligned with contemporaneous restitution schemes. Further, the forfeiture by von Saher's predecessors was neither accidental nor ill informed—on the advice of counsel, the family affirmatively chose not to pursue any restoration of rights.

Because the Dutch government did not "confiscate" the paintings from von Saher's family after 1959, and because

---

[14] Von Saher acknowledges that Military Law 59 transferred unclaimed property to the Jewish Restitution Successor Organization, a charitable group, and that the Organization sold that property in order to raise money for survivors, but "only after the deadline for claims had expired."

the conveyance to Stroganoff did not violate international law, the Second Hickenlooper Amendment poses no obstacle to the application of the act of state doctrine.

### III.     THE POLICIES UNDERLYING THE ACT OF STATE DOCTRINE SUPPORT ITS APPLICATION HERE

Even where "the validity of the act of a foreign sovereign within its own territory is called into question, the policies underlying the act of state doctrine may not justify its application." *W.S. Kirkpatrick*, 493 U.S. at 409 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)). The Supreme Court laid out three such policies in *Sabbatino*:

> [1][T]he greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it . . . . [2][T]he less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. [3]The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence.

376 U.S. at 428; *see also W.S. Kirkpatrick*, 493 U.S. at 409.

All three of these policies support invocation of the doctrine here. Notably, no one has identified an international consensus regarding the *invalidity* of the Dutch post-war restitution procedures. If anything, the U.S. State Department and Office of the Solicitor General expressed in their amicus brief in *Von Saher I* that post-war restitution

proceedings in the Netherlands were "bona fide." *See Von Saher II*, 754 F.3d at 729–30 (Wardlaw, J., dissenting). Second, the State Department and Solicitor General's Office confirmed in their brief that upholding the Dutch government's actions is important for U.S. foreign policy:

> When a foreign nation, like the Netherlands here, has conducted bona fide post-war internal restitution proceedings following the return of Nazi-confiscated art to that nation under the external restitution policy, *the United States has a substantial interest in respecting the outcome of the nation's proceedings*.

(Emphasis added).[15]   This position makes practical sense. Reaching into the Dutch government's post-war restitution system would require making sensitive political judgments that would undermine international comity. *See W.S. Kirkpatrick*, 493 U.S. at 408 (underscoring that "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of

---

[15] In *Von Saher II*, we concluded that von Saher's claims against the Museum "do not conflict with foreign policy," and that this case presents, "instead, a dispute between private parties."  754 F.3d at 724. In doing so, we did not give the amicus brief "serious weight."  *Id.* Although *Von Saher II* is precedential authority, that decision left open whether the act of state doctrine applies. *Id.* at 725–27.  We ought not exclude the State Department's views when considering the doctrine's application, especially when assessing the degree to which our decision will affect foreign policy.  We acknowledge that we are not bound by those views. *Cf. Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018) (holding that courts "should accord respectful consideration to" a foreign government's amicus brief, but are "not bound to accord conclusive effect to the foreign government's statements").

embarrassment to the Executive Branch in its conduct of foreign relations" are policies behind the doctrine).  For example, von Saher asks us to conclude that filing an E100 claim for the Cranachs in the 1950s would have been "futile."  So deciding would demand a judgment that the post-war Dutch system was incapable of functioning, a proposition that has not been proven here.  Finally, we are dealing with a government that has been in continuous existence since the relevant acts of state.  As noted, the decisions of the Dutch Court of Appeals and the State Secretary that deemed the Cranachs a "settled" question are quite recent.  Von Saher asks us to do what the Dutch government refused to do in the 1999 Court of Appeals decision—restore her rights to the Cranachs.  Second-guessing the Dutch government would violate our "commitment to respect the finality of 'appropriate actions' taken by foreign nations to facilitate the internal restitution of plundered art."  *Von Saher II*, 754 F.3d at 721.

Our judiciary created the act of state doctrine for cases like this one.  In applying it, we presume the validity of the Dutch government's sensitive policy judgments and avoid embroiling our domestic courts in re-litigating long-resolved matters entangled with foreign affairs. Without question, the Nazi plunder of artwork was a moral atrocity that compels an appropriate governmental response. But the record on remand reveals an official conveyance from the Dutch government to Stroganoff thrice "settled" by Dutch authorities.  For all the reasons the doctrine exists, we

decline the invitation to invalidate the official actions of the Netherlands.**[16]**

**AFFIRMED.**

---

WARDLAW, Circuit Judge, concurring:

This case should not have been litigated through the summary judgment stage.  The district court correctly dismissed this case on preemption grounds in March 2012. Those grounds did not require any further factual development of the record, and were valid even taking all of the facts in the light most favorable to Von Saher.  So here we are in 2018, over a decade from the date Von Saher filed her federal action, reaching an issue we need not have reached, to finally decide that the Cranachs, which have hung in the Norton Simon Museum nearly fifty years, may remain there.

In my 2014 dissenting opinion (attached), I noted that further adjudication of the Netherlands proceedings may implicate the act of state doctrine because "'the outcome' of this inquiry 'turns upon[] the effect of official action by a foreign sovereign.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 730 n.2 (9th Cir. 2014) (Wardlaw, J., dissenting) (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990)). Though I did not reach the act of state doctrine, the prior panel could have because all of the historical official acts of

---

**[16]** We thank the parties' counsel and *amici curiae* for submitting extensive and informative briefs detailing the many factual and international law intricacies in this appeal.

the Netherlands were in the record at the time of the motion to dismiss.  And, because I agree that "there is little doubt that the Dutch government's conveyance to Stroganoff qualifies as an official act of the Netherlands," Majority Op. at 19, I concur.

**ATTACHMENT**

754 F.3d 712
United States Court of Appeals,
Ninth Circuit.

Marei VON SAHER, Plaintiff–Appellant,

v.

NORTON SIMON MUSEUM OF ART
AT PASADENA; Norton Simon Art
Foundation, Defendants–Appellees.

No. 12–55733.
|
Argued and Submitted Aug. 22, 2013.
|
Filed June 6, 2014.

**Synopsis**

**Background:** Heir of Netherlands art dealer brought action in diversity against art museum, seeking return of two paintings alleged to have been looted by Nazis during World War II. The district court, 2007 WL 4302726, dismissed action with prejudice. Heir appealed. The Court of Appeals, 592 F.3d 954, affirmed in part, reversed in part, and remanded. The United States District Court for the Central District of California, John F. Walter, J., 862 F.Supp.2d 1044, dismissed the action as barred by conflict preemption. Heir appealed.

**Holdings:** The Court of Appeals, D.W. Nelson, Senior Circuit Judge, held that:

[1] heir's claims for replevin and conversion did not conflict with foreign policy;

[2] serious weight did not have to be given to Executive Branch's view of impact that case had on foreign policy; and

[3] remand was required for district court to determine whether initial transfer of paintings from Netherlands to third-party was a sovereign act, and whether any exception to act of state doctrine applied if it was.

Reversed and remanded.

Wardlaw, Circuit Judge, filed dissenting opinion.

**West Codenotes**

**Recognized as Preempted**

West's Ann.Cal.C.C.P. § 354.3

**Attorneys and Law Firms**

**\*714** Lawrence M. Kaye (argued), Herrick, Feinstein LLP, New York, New York; Donald S. Burris, Burris, Schoenberg & Walden, LLP, Los Angeles, for Plaintiff–Appellant.

Fred A. Rowley, Jr. (argued), Munger, Tolles & Olson LLP, Los Angeles, CA, for Defendant–Appellee.

Catherine Z. Ysrael, Deputy Attorney General, for Amicus Curiae State of CA.

Appeal from the United States District Court for the Central District of California, John F. Walter, District Judge, Presiding. D.C. No. 2:07–CV–02866–JFW–JTL.

Before: HARRY PREGERSON, DOROTHY W. NELSON, and KIM McLANE WARDLAW, Circuit Judges.

**OPINION**

D.W. NELSON, Senior Circuit Judge:

This case concerns the fate of two life-size panels painted by Lucas Cranach the Elder in the sixteenth century. *Adam* and *Eve* (collectively, "the Cranachs" or "the panels") hang today in Pasadena's Norton Simon Museum of Art ("the Museum"). Marei Von Saher claims she is the rightful owner of the panels, which the Nazis forcibly purchased from her deceased husband's family during World War II. The district court dismissed Von Saher's complaint as insufficient to state a claim upon which relief can be granted, and that dismissal is before us on appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand.

**I. Background**

In reviewing the district court's decision, we must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to" Von Saher. *Manzarek v. St. Paul Fire & Marine Ins. Co.,* 519 F.3d

1025, 1031 (9th Cir.2008). We therefore hew closely to the **\*715** allegations in the complaint in describing the facts.

### A. Jacques Goudstikker Acquires the Cranachs

For the 400 years following their creation in 1530, the panels hung in the Church of the Holy Trinity in Kiev, Ukraine. In 1927, Soviet authorities sent the panels to a state-owned museum at a monastery and in 1927 transferred them to the Art Museum at the Ukrainian Academy of Science in Kiev. Soviet authorities then began to arrange to sell state-owned artworks abroad and held an auction in Berlin in 1931 as part of that effort. This auction, titled "The Stroganoff Collection," included artworks previously owned by the Stroganoff family. The collection also included the Cranachs, though Von Saher disputes that the Stroganoffs ever owned the panels. Jacques Goudstikker, who lived in the Netherlands with his wife, Desi, and their only child, Edo, purchased the Cranachs at the 1931 auction.

### B. The Nazis Confiscate the Cranachs

Nearly a decade hence in May 1940, the Nazis invaded the Netherlands. The Goudstikkers, a Jewish family, fled. They left behind their gallery, which contained more than 1,200 artworks—the Cranachs among them. The family boarded the SS Bodegraven, a ship bound for South America. Days into their journey, Jacques accidentally fell to his death through an uncovered hatch in the ship's deck. When he died, Jacques had with him a black notebook, which contained entries describing the artworks in the Goudstikker Collection and which is known by art historians and experts as "the Blackbook." Desi retrieved the Blackbook when Jacques died. It lists the Cranachs as part of the Goudstikker Collection.

Meanwhile, back in the Netherlands, high-level Nazi Reichsmarschall Herman Göring divested the Goudstikker Collection of its assets, including the Cranachs. Jacques' mother, Emilie, had remained in the Netherlands when her son fled to South America with his wife and child. Göring's agent warned Emilie that he intended to confiscate the Goudstikker assets, but if she cooperated in that process, the Nazis would protect her from harm. Thus, Emilie was persuaded to vote her minority block of shares in the Goudstikker Gallery to effectuate a "sale" of the gallery's assets for a fraction of their value.

Employees of the Goudstikker Gallery contacted Desi to obtain her consent to a sale of the majority of the outstanding shares in the gallery, which she had inherited upon Jacques' death. She refused. Nevertheless, the sale went through when two gallery employees, unauthorized to sell its assets, subsequently entered into two illegal contracts. In the first, the "Göring transaction," Göring "purchased" 800 of the most valuable artworks in the Goudstikker collection. Göring then took those pieces, including the Cranachs, from the Netherlands to Germany. He displayed *Adam* and *Eve* in Carinhall, his country estate near Berlin. properties. Miedl began operating an art dealership out of Jacques' gallery with the artwork that Göring left behind. Miedl employed Jacques' former employees as his own and traded on the goodwill of the Goudstikker name in the art world.

### C. The Allies Recover Nazi–Looted Art, Including the Cranachs

In the summer of 1943, the United States, the Netherlands and other nations signed the London Declaration, which "served as a formal warning to all concerned, and in particular persons in neutral **\*716** countries, that the Allies intended to do their utmost to defeat the methods of dispossession practiced by the governments with which they [were] at war." *Yon Saher v. Norton Simon Museum of Art at Pasadena* ("*Von Saher I* "), 592 F.3d 954, 962 (9th Cir.2010) (internal quotation marks and citation omitted). The Allies "reserved the right to invalidate wartime transfers of property, regardless of whether" those transfers took the form of open looting, plunder or forced sales. *Id.*

When American forces arrived on German soil in the winter of 1944 and 1945, they discovered large caches of Nazi-looted and stolen art hidden in castles, banks, salt mines and caves. *Von Saher I, 592 F.3d at 962*. The United States established collection points for gathering, cataloging and caring for the recovered pieces. *Id.* At a collection point in Munich, Allied forces identified the Cranachs and other items from the Goudstikker Collection.

In order to reunite stolen works of art with their rightful owners, President Truman approved a policy statement setting forth the procedures governing looted artwork found in areas under U.S. control. *Von Saher I, 592 F.3d at 962*. These procedures had two components —external restitution and internal restitution. Under

external restitution, nations formerly occupied by the Germans would present to U.S. authorities "consolidated lists of items taken [from their citizens] by the Germans." *Id.* These lists would include "information about the location and circumstances of the theft." *Id.* American authorities would identify the listed artworks and return them to their country of origin. *Id.* The United States stopped accepting claims for external restitution on September 15, 1948. *Id.* at 963. Under internal restitution, each nation had the responsibility for restoring the externally restituted artworks to their rightful owners. *Id.*

In 1946, the Allied Forces returned the pieces from the Goudstikker Collection to the Dutch government so that the artworks could be held in trust for their lawful owners: Desi, Edo and Emilie.

### D. Desi's Postwar Attempt to Recover the Cranachs

In 1944, the Dutch government issued the Restitution of Legal Rights Decree, which established internal restitution procedures for the Netherlands. As a condition of restitution, people whose artworks were returned to them had to pay back any compensation received in a forced sale.

In 1946, Desi returned to the Netherlands intending to seek internal restitution of her property. Upon her return but before she made an official claim, the Dutch government characterized the Göring and Miedl transactions as voluntary sales undertaken without coercion. Thus, the government determined that it had no obligation to restore the looted property to the Goudstikker family. The government also took the position that if Desi wanted her property returned, she would have to pay for it, and she would not receive compensation for missing property, the loss of goodwill associated with the Goudstikker gallery's name or the profits Miedl made off the gallery during the war.

Desi decided to file a restitution claim for the property sold in the Miedl transaction, so that she could recover her home and some of her personal possessions. In 1952, she entered into a settlement agreement with the Dutch government, under protest, regarding only the Miedl transaction. As part of that settlement, Desi repurchased the property Miedl took from her for an amount she could afford. The agreement stated that Desi acquiesced to the settlement in order **\*717** to avoid years of expensive litigation and due to her dissatisfaction with

the Dutch government's refusal to compensate her for the extraordinary losses the Goudstikker family suffered at the hands of the Nazis during the war.

Given the government's position that the Nazi-era sales were voluntary and because of its refusal to compensate the Goudstikkers for their losses, Desi believed that she would not be successful in a restitution proceeding to recover the artworks Göring had looted. She therefore opted not to file a restitution claim related to the Göring transaction. The Netherlands kept the Göring-looted artworks in the Dutch National Collection. Von Saher alleges that title in these pieces did not pass to the Dutch Government.

In the 1950s, the Dutch government auctioned off at least 63 of the Goudstikker paintings recovered from Göring. These pieces did not include the Cranachs.

### E. Von Saher Recovers Artwork from the Dutch Government

In the meantime, Desi and her son Edo became American citizens, and Desi married August Edward Dimitri Von Saher. When Emilie died in 1954, she left all of her assets, including her share in the Goudstikker Gallery, to her daughter-in-law, Desi, and her grandson, Edo. Desi then died in February 1996, leaving all of her assets to Edo. Just months later, in July 1996, Edo died and left his entire estate to his wife, Marei Von Saher, the plaintiff-appellant. Thus, Marei is the sole living heir to Jacques Goudstikker.

In 1997, the State Secretary of the Dutch Government's Ministry of Education, Culture and Science (the "State Secretary") announced that the Dutch government had undertaken an investigation into the provenance of artworks recovered in Germany and returned to the Netherlands following Word War II. Related to that investigation, the government began accepting claims for recovered artworks in its custody that had not been restituted after the war.

Around the same time, a Dutch journalist contacted Von Saher and explained to her the circumstances regarding Göring's looting of the Goudstikker gallery, Desi's efforts to obtain restitution and the Dutch government's continued possession of some Goudstikker pieces in its national collection. This conversation was the first time Von Saher learned about these events.

In 1998, Von Saher wrote to the Dutch State Secretary requesting the surrender of all of the property from the Goudstikker collection in the custody of the Dutch government. The State Secretary rejected this request, concluding that the postwar restitution proceedings were conducted carefully and declining to waive the statute of limitations so that Von Saher could submit a claim. Von Saher made various attempts to appeal this decision without success.

While Von Saher pursued various legal challenges, the Dutch government created the Ekkart Committee to investigate the provenance of art in the custody of the Netherlands. The committee described the handling of restitution in the immediate postwar period as "legalistic, bureaucratic, cold and often even callous." It also criticized many aspects of the internal restitution process, among them employing a narrow definition of "involuntary loss" and requiring owners to return proceeds from forced sales as a condition of restitution.

Upon the recommendation of the Ekkart Committee, the Dutch government created the Origins Unknown project to trace the original owners of the artwork in its custody. The Dutch government also set up the **\*718** Advisory Committee on the Assessment of Restitution Applications for Items of Cultural Value and the Second World War ("the Restitutions Committee") to evaluate restitution claims and to provide guidance to the Ministry for Education, Culture and Science on those claims. Between 2002 and 2007, the Restitution Committee received 90 claims.

In 2004, Von Saher made a restitution claim for all of the Goudstikker artwork in the possession of the Netherlands. The Committee recommended that the government grant the application with respect to all of the artworks plundered in the Göring transaction, which the Committee deemed involuntary. The State Secretary adopted the Committee's recommendation.

Unfortunately, the Dutch government no longer had custody of the Cranachs. In 1961, George Stroganoff Scherbatoff ("Stroganoff") claimed that the Soviet Union had wrongly seized the Cranachs from his family and unlawfully sold the paintings to Jacques Goudstikker 30 years earlier at the "Stroganoff Collection" auction in Berlin. Thus, Stroganoff claimed that the Dutch

government had no right, title or interest in the panels. In 1966, the Dutch government transferred the Cranachs and a third painting to Stroganoff in exchange for a monetary payment. The terms of this transaction, including the amount Stroganoff paid for the artworks, are not in the record before us. The Dutch government did not notify Desi or Edo that Stroganoff made a claim to the panels or that the panels were being transferred to him. In 1971, New York art dealer Spencer Samuels acquired the Cranachs from Stroganoff, either as an agent or as a purchaser. Later that year, the Museum acquired the Cranachs and has possessed them ever since.

### F. Von Saher Seeks Recovery From The Museum

In 2000, a Ukranian art historian researching the deaccession of artworks from state-owned museums in Kiev contacted Von Saher. He explained to Von Saher that he happened upon *Adam* and *Eve* when he visited the Museum, and once he researched the origin of the panels, he felt compelled to contact her. Because Cranach the Elder painted 30 similar depictions of *Adam* and *Eve,* Von Saher could not be certain whether the diptychs in the Museum were the ones missing from the Goudstikker collection. She contacted the Museum about the panels, and the parties engaged in a six-year effort to resolve this matter informally, which proved unsuccessful.

In May 2007, Von Saher sued the Museum, relying on California Code of Civil Procedure Section 354.3. That statute allowed the rightful owners of confiscated Holocaust-era artwork to recover their items from museums or galleries and set a filing deadline of December 31, 2010. Cal.Civ.Proc.Code § 354.3(b), (c).

The district court dismissed the action, finding Section 354.3 facially unconstitutional on the basis of field preemption. The court also found Von Saher's claims untimely.

We affirmed, over Judge Pregerson's dissent, holding Section 354.3 unconstitutional on the basis of field preemption. *Von Saher I,* 592 F.3d at 957. Because it was unclear whether Von Saher could amend her complaint to show lack of reasonable notice to establish compliance with California Code of Civil Procedure Section 338(c), we unanimously remanded. *Id.* at 968–70.

Six weeks after this court issued *Von Saher I,* the California legislature amended Section 338(c) to extend

the statute of **\*719** limitations from three to six years for claims concerning the recovery of fine art from a museum, gallery, auctioneer or dealer. Cal.Civ.Proc.Code § 338(c)(3)(A). In addition, the amendments provided that a claim for the recovery of fine art does not accrue until the actual discovery of both the identity and the whereabouts of the artwork. *Id.* The legislature made these changes explicitly retroactive. *Id.* § 338(c)(3)(B).

Von Saher filed a First Amended Complaint. The Museum moved to dismiss, arguing that Von Saher's specific claims and the remedies she sought—not the amended Section 338 itself—conflicted with the United States' express federal policy on recovered art. The district court agreed. It held that the Solicitor General's brief filed in the Supreme Court in connection with Von Saher's petition for writ of certiorari from *Von Saher I,* "clarified the United States' foreign policy as it specifically relates to Plaintiff's claims in this litigation." The district court held "that the United States' policy of external restitution and respect for the outcome and finality of the Netherlands' bona fide restitution proceedings, as clearly expressed and explained by the Solicitor General in his amicus curiae brief, directly conflicts with the relief sought in Plaintiff's action." The court dismissed the complaint with prejudice. Von Saher timely appeals.

## II. Standard of Review
We review de novo the district court's dismissal of Von Saher's complaint. *Manzarek,* 519 F.3d at 1030. As discussed, we must accept the factual allegations in the complaint as true, and we construe the complaint in the light most favorable to Von Saher. *Id.* at 1031.

## III. Discussion
We first must decide whether the district court erred in finding Von Saher's claims barred by conflict preemption. It did.

### A. Applicable Law
**[1]** **[2]** "[T]he Constitution allocates the power over foreign affairs to the federal government exclusively, and the power to make and resolve war, including the authority to resolve war claims, is central to the foreign affairs power in the constitutional design." *Deutsch v. Turner Corp.,* 324 F.3d 692, 713–14 (9th Cir.2003). "In the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Id.* at 714.

**[3]** **[4]** "Foreign affairs preemption encompasses two related, but distinct, doctrines: conflict preemption and field preemption." *Movsesian v. Victoria Versicherung AG,* 670 F.3d 1067, 1071 (9th Cir.2012) (en banc). In *Von Saher I,* we found Section 354.3 unconstitutional on the basis of field preemption. 592 F.3d at 965, 968. Here, however, the Museum's argument focuses exclusively on conflict preemption. Specifically, the Museum contends that Von Saher's claims, and the remedies she seeks, are in conflict with federal policy on the restitution of Nazi-stolen art.

**[5]** **[6]** "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." **\*720** *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 413, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427 n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)). "The exercise of the federal executive authority means that state law must give way where ... there is evidence of a clear conflict between the policies adopted by the two." *Id.* at 421, 123 S.Ct. 2374. "[T]he likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law." *Id.* at 420, 123 S.Ct. 2374. Similarly, a state law is preempted "where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of" federal policy. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotations marks and citations omitted).

Courts have found individual claims, or even entire lawsuits, preempted where a plaintiff relies on a statute of general applicability, as Von Saher does here. *See, e.g., In re: Assicurazioni Generali S.P.A. Holocaust Ins. Litig.,* 340 F.Supp.2d 494, 501 (S.D.N.Y.2004) (holding *Garamendi* "requires dismissal ... of the benefits claims arising under generally applicable state statutes and common law"

because "[l]itigation of Holocaust-era insurance claims, no matter the particular source of law under which the claims arise, necessarily conflicts with the executive policy favoring voluntary resolution of claims through [the International Commission on Holocaust Era Insurance Claims]"), *aff'd,* 592 F.3d 113 (2d Cir.2010); *see also Mujica v. Occidental Petrol. Corp.,* 381 F.Supp.2d 1164, 1187–88 (C.D.Cal.2005) (finding plaintiffs' state law tort claims preempted by the foreign policy interest in the United States' "bilateral relationship with the Columbian government").

The question we must answer is whether Von Saher's claims for replevin and conversion, as well as the remedies she seeks, conflict with federal policy. We conclude that they do not.

### B. Federal Policy on Nazi–Looted Art

We start by looking to federal policy on the restitution of Nazi-looted art. As discussed, the United States signed the London Declaration and subsequently adopted a policy of external restitution based on the principles in that declaration. In *Von Saher I,* we noted that the United States stopped accepting claims for external restitution on September 15, 1948, and accordingly concluded that the United States' policy of external restitution ended that year. 592 F.3d at 963. Thus, we held that California Civil Procedure Code Section 354.3 could not "conflict with or stand as an obstacle to a policy that is no longer in effect." *Id.*

It seems that we misunderstood federal policy. In a 2011 brief filed in the Supreme Court recommending the denial of a petition for writ of certiorari in *Von Saher I,* the United States, via the Solicitor General, reaffirmed our nation's continuing and ongoing commitment to external restitution. The Solicitor General explained that external restitution did not end in 1948 with the deadline for submitting restitution claims, as we had concluded in *Von Saher I.* Instead, "[t]he United States established a deadline to ensure prompt submission of claims and achieve finality in the wartime restitution process," and the United States has a "continuing interest in that finality when appropriate actions have been taken by a foreign government concerning the internal restitution of art."

**\*721** Federal policy also includes the Washington Conference Principles on Nazi Confiscated Art ("the Principles"), produced at the Washington Conference

on Holocaust–Era Art Assets in 1998. Though non-binding, the Principles reflect a consensus reached by the representatives of 13 nongovernmental organizations and 44 governments, including both the United States and the Netherlands, to resolve issues related to Nazi-looted art. The Principles provided first that "Art that has been confiscated by the Nazis and not subsequently restituted should be identified" and that "[e]very effort should be made to publicize" this art "in order to locate pre-War owners and their heirs." The signatories agreed that "[p]re-war owners and their heirs should be encouraged to come forward and make known their claims to art that was confiscated by the Nazis and not subsequently restituted." The Principles also provided that when such heirs are located, "steps should be taken expeditiously to achieve a just and fair solution, recognizing this may vary according to facts and circumstances surrounding a specific case." Finally, the Principles encouraged nations "to develop national processes to implement these principles," including alternative dispute resolution.

Additionally, in 2009, the United States participated in the Prague Holocaust Era Assets Conference, which produced the "legally non-binding" Terezin Declaration on Holocaust Era Assets and Related Issues, to which the United States and the Netherlands agreed. The signatories reaffirmed their support for the Washington Conference Principles and "encourage[d] all parties [,] *including public and private institutions* and individuals to apply them as well." "The Participating States urge[d] that every effort be made to rectify the consequences of wrongful property seizures, such as confiscations, forced sales and sales under duress[.]" In addition, the signatories "urge[d] all stakeholders to ensure that their legal systems or alternative processes ... facilitate just and fair solutions with regard to Nazi-confiscated and looted art and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by the parties."

**[7]** In sum, U.S. policy on the restitution of Nazi-looted art includes the following tenets: (1) a commitment to respect the finality of "appropriate actions" taken by foreign nations to facilitate the internal restitution of plundered art; (2) a pledge to identify Nazi-looted art that has not been restituted and to publicize those artworks in order to facilitate the identification of prewar owners and their heirs; (3) the encouragement of prewar owners and

their heirs to come forward and claim art that has not been restituted; (4) concerted efforts to achieve expeditious, just and fair outcomes when heirs claim ownership to looted art; (5) the encouragement of everyone, including public and private institutions, to follow the Washington Principles; and (6) a recommendation that every effort be made to remedy the consequences of forced sales.

### C. Von Saher's Claims Do Not Conflict with Federal Policy

Von Saher's claims do not conflict with any federal policy because the Cranachs were never subject to postwar internal restitution proceedings in the Netherlands, as noted in the complaint, the district court's order and the opinion of the Court of Appeals of The Hague.

Desi could have brought a claim for restitution as to all of the artworks Göring looted in the immediate postwar period, but she understandably chose not to do so **\*722** prior to the July 1, 1951 deadline. Per Von Saher, the "[h]istorical literature makes clear that the post-War Dutch Government was concerned that the immediate and automatic return of Jewish property to its original owners would have created chaos in the legal system and damaged the economic recovery of [t]he Netherlands," and "[t]his attitude was reflected in the restitution process." Desi was "met with hostility by the postwar Dutch Government" and "confronted a 'restitution' regime that made it difficult for Jews like [her] to recover their property." In fact, the Dutch government went so far as to take the "astonishing position" that the transaction between Göring and the Goudstikker Gallery was voluntary and taken without coercion. Not surprisingly, Desi decided that she could not achieve a successful result in a sham restitution proceeding to recover the artworks Göring had looted. The Dutch government later admitted as much when the Ekkart Committee described the immediate postwar restitution process as "legalistic, bureaucratic, cold and often even callous."

Moreover, the Dutch government transferred the Cranachs to Stroganoff fourteen years after Desi settled her claim against Miedl. The Museum contends that this conveyance satisfied a restitution claim Stroganoff made as the rightful heir to the Cranachs, but the record casts doubt on that characterization. As noted, the deadline for filing an internal restitution claim in the Netherlands expired July 1, 1951, and Stroganoff did not

assert his claim to the Cranachs until a decade later. In addition, the Restitution of Legal Rights Decree, which governed the Dutch internal restitution process, was established to create "special rules regarding restitution of legal rights and restoration of rights in connection with the liberalization of the [Netherlands]" following World War II. The Decree included provisions addressing the restitution of wrongful acts committed in enemy territory during the war. To the extent that Stroganoff made a claim of restitution, however, it was based on the allegedly wrongful seizure of the paintings by the Soviet Union *before* the Soviets sold the Cranachs to Jacques Goudstikker in 1931—events which predated the war and any wartime seizure of property. Thus, it seems dubious at best to cast Stroganoff's claim as one of internal restitution.

By the time Von Saher requested in 1998 that the Dutch government surrender all of the Goudstikker artworks within state control, the Cranachs had been in the Museum's possession for 27 years. Even if Desi's 1998 request for surrender could be construed as a claim for restitution—made nearly 50 years after the deadline for filing such a claim lapsed—the Cranachs were no longer in possession of the Dutch government and necessarily fell outside that claim. [1]

Though we recognize that the United States has a continuing interest in respecting the finality of "appropriate actions" taken in a foreign nation to restitute Nazi-confiscated art, the Dutch government itself has acknowledged the "legalistic, bureaucratic, cold and often even callous" nature of the initial postwar restitution **\*723** system. And the Dutch State Secretary eventually ordered the return of all the Göring-looted artworks possessed by the Netherlands—the very artwork Desi chose not to seek in the postwar restitution process immediately following the war—to Von Saher. These events raise serious questions about whether the initial postwar internal restitution process constitutes an appropriate action taken by the Netherlands.

Nevertheless, we do not even need to go so far as answering that query, nor should we on a motion to dismiss. Based on Von Saher's allegations that (1) Desi chose not to participate in the initial postwar restitution process, (2) the Dutch government transferred the Cranachs to Stroganoff before Desi or her heirs could make another claim and (3) Stroganoff's claim

likely was not one of internal restitution, the diptych was never subject to a postwar internal restitution proceeding in the Netherlands. Thus, allowing Von Saher's claim to go forward would not disturb the finality of any internal restitution proceedings—appropriate or not—in the Netherlands.

Not only do we find an absence of conflict between Von Saher's claims and federal policy, but we believe her claims are in concert with that policy. Von Saher is just the sort of heir that the Washington Principles and Terezin Declaration encouraged to come forward to make claims, again, because the Cranachs were never subject to internal restitution proceedings. Moreover, allowing her lawsuit to proceed would encourage the Museum, a private entity, to follow the Washington Principles, as the Terezin Declaration urged. Perhaps most importantly, this litigation may provide Von Saher an opportunity to achieve a just and fair outcome to rectify the consequences of the forced transaction with Göring during the war, even if such a result is no longer capable of being expeditiously obtained.

Nor is this dispute of the sort found to involve the international problems evident in *American Insurance Association v. Garamendi.* In that case, California passed legislation that deemed the confiscation or frustration of World War II insurance policies for Jewish policy holders an unfair business practice. 539 U.S. at 408–11, 123 S.Ct. 2374. California's insurance commissioner then issued administrative subpoenas against several subsidiaries of European insurance companies. *Id.* at 411, 123 S.Ct. 2374. Those insurance companies filed suit seeing injunctive relief against the insurance commission of California and challenging California's Holocaust-era insurance legislation as unconstitutional. *Id.* at 412, 123 S.Ct. 2374. The Supreme Court held the law preempted due to the "clear conflict" between the policies adopted by the federal government and the state of California. *Id.* at 419–21, 123 S.Ct. 2374. As part of that holding, the Court noted that "[v]indicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed." *Id.* at 421, 123 S.Ct. 2374.

Here, however, there is no Holocaust-specific legislation at issue. Instead, Von Saher brings claims pursuant to a state statute of general applicability. Also unlike *Garamendi,* Von Saher seeks relief from an American museum that had no connection to the wartime injustices committed against the Goudstikkers. Nor does Von Saher seek relief from the Dutch government itself. In fact, the record contains a 2006 letter from the Dutch Minister for Education, Culture and Science, who confirmed that "the State of the Netherlands **\*724** is not involved in this dispute" between Von Saher and the Museum. The Minister also opined that this case "concerns a dispute between two private parties."

[8] We are not at all persuaded, as is the dissent, that the Solicitor General's brief requires a different outcome. Certainly, "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of [a] case's impact on foreign policy." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). But there are many reasons why we find that weight unwarranted here.

First, the Solicitor General's brief, which urged denying the petition for writ of certiorari in *Von Saher I,* focused on California Code of Civil Procedure Section 354.3. The Solicitor General argued that we had correctly invalidated Section 354.3 as "impermissibly intrud[ing] upon the foreign affairs authorities of the federal government." The Solicitor General noted that *Von Saher I* did not involve the application of a state statute of general applicability but "a state statute that is specifically and purposefully directed at claims arising out of transactions and events that occurred in Europe during the Nazi era, that in many cases were addressed in the post-War period by the United States and European Governments[.]" That is an altogether different issue from the one we now decide, which is whether Von Saher's specific claims against the Museum—in just this one case—conflict with foreign policy. This argument is not one the Solicitor General considered or addressed when it counseled against granting certiorari in *Von Saher I,* and we decline to read any more into the Solicitor General's brief than is there.

It also concerns us that the Solicitor General characterizes the facts in a way that conflicts with the complaint, the record before us and the parties' positions. The Solicitor General argued that *Von Saher I* "concerns artworks and transactions that, consistent with U.S. policies, have already been the subject of both external

and internal restitution proceedings, including recent proceedings by the Netherlands in response to the Washington Principles." As we have discussed, however, the Cranachs were not subject to immediate postwar internal restitution proceedings in the Netherlands, and Von Saher's 1998 and 2004 claims did not include the Cranachs.

This factual discrepancy also makes us wary of giving too much credence to the Solicitor General's brief because it demonstrates that the Solicitor General goes beyond explaining federal foreign policy and appears to make factual determinations. For instance, the Solicitor General's conclusion that the Cranachs have already been subject to both internal and external restitution proceedings is not a statement about our nation's general approach to Nazi-looted art. Instead, the Solicitor General concludes that in this specific case involving these specific parties, external restitution took place as contemplated by the United States. This looks much like a factual finding in a matter in which we must accept the allegations in the complaint as true. While we recognize and respect the Solicitor General's role in addressing how a matter may affect foreign policy, we do not believe this extends to making factual findings in conflict with the allegations in the complaint, the record and the parties' arguments.

Most worrisome, the Solicitor General admitted that "[t]he United States does not contend that the fact that the Cranachs were returned to the Dutch government pursuant to the external restitution policy would be sufficient on its own force to bar litigation if, for example, the Cranachs had not been subject (or potentially subject to) bona fide restitution proceedings in the Netherlands." And therein lies the most serious and troublesome obstacle **\*725** to our relying too heavily on the Solicitor General's brief. Von Saher alleges, the Museum agrees and the record shows that the Cranachs were never subject to immediate postwar internal restitution proceedings in the Netherlands. Though the paintings were potentially subject to restitution proceedings had Desi opted to participate in the postwar internal restitution process, she chose not to engage in what she felt was an unjust and unfair proceeding. Years later, the Dutch government itself undermined the legitimacy of that restitution process by describing it as "bureaucratic, cold and often even callous," and by eventually restituting to Von Saher all of

the artworks Göring had looted that were still held by the Netherlands.

It would make little sense, then, for us to conclude that Von Saher's claims against the Museum cannot go forward just because the United States returned the Cranachs to the Netherlands as part of the external restitution process, for we know and we cannot ignore, that the Cranachs were never subject to postwar internal restitution proceedings and that the 1998 and 2004 proceedings excluded the Cranachs. We therefore do not find convincing the Solicitor General's position— presented in a brief in a different iteration of this case that raised different arguments, that involved different sources of law and that seems to have misunderstood some of the facts essential to our resolution of this appeal.

Von Saher's claims against the Museum and the remedies she seeks do not conflict with foreign policy. This matter is, instead, a dispute between private parties. The district court erred in concluding otherwise.

### D. Act of State

**[9]** We are mindful that the litigation of this case may implicate the act of state doctrine, though we cannot decide that issue definitively on the record before us. We remand for further development of this issue.

**[10]** **[11]** "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897). "[T]he act within its own boundaries of one sovereign state cannot become the subject of re-examination and modification in the courts of another. Such action when shown to have been taken, becomes, ... a rule of decision for the courts of this country." *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 310, 38 S.Ct. 312, 62 L.Ed. 733 (1918).

**[12]** "In every case in which ... the act of state doctrine appli[es], the relief sought ... would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 405, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). This doctrine is not "inflexible and all-encompassing," *Banco Nacional de Cuba,* 376 U.S. at

428, 84 S.Ct. 923, nor is it "some vague doctrine of abstention but a *principle of decision* binding on federal and state courts alike," *W.S. Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. 701 (internal quotation marks and citation omitted). The justification for invoking the act of state doctrine "depends greatly on the importance of the issue's implications for our foreign policy." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1047 (9th Cir.1983).

Von Saher seeks as remedies a declaration that she is the rightful owner of the panels and an order both quieting title in **\*726** them and directing their immediate delivery to her. According this kind of relief may implicate the act of state doctrine. *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 303–04, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (holding act of state doctrine barred American courts from considering the sale of animal hides by the Mexican government); *Ricaud,* 246 U.S. at 310, 38 S.Ct. 312 (holding act of state doctrine prohibited American courts from considering the seizure of an American citizen's property by the Mexican government for military purposes).

Thus, it becomes important to determine whether the conveyance to Stroganoff constituted an official act of a sovereign, which might trigger the act of state doctrine. *W.S. Kirkpatrick,* 493 U.S. at 406, 110 S.Ct. 701 ("Act of state issues only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."). We cannot answer this question because the record is devoid of any information about that transfer. For her part, Von Saher alleges that the Netherlands "wrongfully delivered the Cranachs to Stroganoff as part of a sale transaction," and for the purpose of this appeal, we must accept the allegations in her complaint as true, *Manzarek,* 519 F.3d at 1031. She also contends that no one ever referred to the transfer of the Cranachs to Stroganoff as attendant to "restitution proceedings" until we described the facts that way in *Von Saher I,* 592 F.3d at 959. In her view, the Museum has since adopted that characterization of the facts. The district court is best-equipped to determine which of these competing characterizations is correct.

If on remand, the Museum can show that the Netherlands returned the Cranachs to Stroganoff to satisfy some sort of restitution claim, that act could "constitute a considered policy decision by a government to give effect to its political and public interests ... and so [would be] ... the type of sovereign activity that would be of substantial concern to the executive branch in its conduct of international affairs." *Clayco Petrol. Corp. v. Occidental Petrol. Corp.,* 712 F.2d 404, 406–07 (9th Cir.1983) (per curiam) (internal quotations and citations omitted); *see also Alfred Dunhill of London, Inc. v. Rep. of Cuba,* 425 U.S. 682, 695, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (noting foreign government had not offered a government "statute, decree, order, or resolution" showing that the government action was undertaken as a "sovereign matter"); *but see Clayco,* 712 F.2d at 406–07, 96 S.Ct. 1854 (noting the Third Circuit held that the granting of patents by a foreign sovereign would not implicate the act of state doctrine; *Timberlane Lumber Co. v. Bank of Am., N.T. and S.A.,* 549 F.2d 597, 607–08 (9th Cir.1976) (holding judicial proceedings in another country initiated by a private party were not the sort of sovereign acts that would require deference under the act of state doctrine). On remand, the district court also should consider whether the conveyance of the Cranachs to Stroganoff met public or private interests. *Clayco,* 712 F.2d at 406 (holding that "without sovereign activity effectuating public rather than private interests, the act of state doctrine does not apply") (internal quotation marks and citation omitted).

Even if the district court finds that the transfer of the Cranachs is a sovereign act, it also must determine whether any exception to the act of state doctrine applies. A plurality of the Supreme Court has noted that an exception may exist for "purely commercial acts" in situations where "foreign governments do not exercise powers peculiar to sovereigns" and instead "exercise only those powers that can be exercised **\*727** by private citizens." *Alfred Dunhill,* 425 U.S. at 704, 96 S.Ct. 1854.

We have not yet decided whether to adopt a commercial exception in our Circuit. *Clayco,* 712 F.2d at 408. When presented with this issue previously, we held that even if a commercial exception to the act of state doctrine existed, it did not apply because a private citizen could not have granted a concession to exploit natural resources—the government action at issue in *Clayco. Id.*

On the present record, we are unable to determine whether a commercial exception would apply in this case. Thus, it is unnecessary for us to determine whether our court

recognizes a commercial exception to the act of state doctrine.

Other exceptions to the act of state doctrine may apply. For example, the Hickenlooper Amendment provides that the act of state doctrine does not apply to a taking or confiscation (1) after January 1, 1959, (2) by an act of state (3) in violation of international law. 22 U.S.C. § 2370(e)(2). The Dutch government kept possession of the Cranachs in 1951 when Desi opted not to seek restitution for the artworks Göring had confiscated during the war. Though the government took possession of the pieces before the effective date of the Hickenlooper Amendment, the Dutch government transferred the Cranachs to Stroganoff in 1966. That conveyance may constitute a taking or confiscation from Desi. Again, we cannot determine from the record whether that transaction was a commercial sale or whether the government transferred the Cranachs to Stroganoff to restore his rights in some way. That distinction may bear on whether the Dutch government confiscated the artworks from Desi, via the transfer to Stroganoff, in violation of international law. The district court should consider this issue on remand.

We recognize that this remand puts the district court in a delicate position. The court must use care to "limit[ ] inquiry which would impugn or question the nobility of a foreign nation's motivation." *Clayco,* 712 F.2d at 407 (internal quotation marks and citation omitted). The court also cannot "resolve issues requiring inquiries ... into the authenticity and motivation of the acts of foreign sovereigns." *Id.* at 408 (internal quotation marks and citations omitted). Nevertheless, this case comes to us as an appeal from a dismissal for failure to state a valid claim. The Museum has not yet developed its act of state defense, and Von Saher has not had the opportunity to establish the existence of an exception to that doctrine should it apply. Though this remand necessitates caution and prudence, we believe that the required record development and analysis can be accomplished with faithfulness to the limitations imposed by the act of state doctrine.

**REVERSED and REMANDED.**

WARDLAW, Circuit Judge, dissenting:
The United States has determined that the Netherlands afforded the Goudstikker family an adequate opportunity to recover the artwork that is the subject of this litigation.

Our nation's foreign policy is to respect the finality of the Netherlands' restitution proceedings and to avoid involvement in any ownership dispute over the Cranachs. Because entertaining Marei Von Saher's state law claims would conflict with this federal policy, I respectfully dissent.

**I.**

The United States has articulated the foreign policy applicable to the very artwork and transactions at issue here. When Von Saher petitioned for certiorari **\*728** from our court's decision rejecting her claims under Cal.Civ.Proc.Code § 354.3 on preemption grounds, the Supreme Court invited the Solicitor General to express the position of the United States on the question there presented. The United States set forth its policy in an amicus curiae brief signed by Harold Hongju Koh, then the Legal Adviser to the Department of State, and Neal Kumar Katyal, then the Acting Solicitor General.

The United States explained that its post-World War II policy of "external restitution" did not end on September 15, 1948, as our court had determined, but remains extant. After World War II, the United States determined that it would return private property expropriated by the Nazis to its country of origin—that is, "externally"— rather than to its private owners. In turn, the country of origin was responsible for returning the property to its lawful owners through "internal" restitution proceedings. A central purpose of this policy was to avoid entangling the United States in difficult, long-lasting disputes over private ownership. For this reason, the United States expressed its "continuing interest" in the finality of external restitution, "when appropriate actions have been taken by a foreign government concerning the internal restitution of art that was externally restituted to it by the United States following World War II."

The United States and the international community have also recognized, however, that some countries' internal restitution processes were deficient. Accordingly, pursuant to such non-binding international agreements as the Washington Principles and the Terezin Declaration, the United States supports ongoing efforts to restore expropriated art to Holocaust victims and their heirs. Furthermore, the United States does not categorically insist upon the finality of its postwar external restitution

efforts. Our nation maintains a continuing interest in the finality of external restitution only when the country of origin has taken "appropriate" internal restitution measures. The United States has a "substantial interest in respecting the outcome" of "bona fide" proceedings conducted by other countries. Thus, the policy of the United States, as expressed in its Supreme Court brief, is that World War II property claims may not be litigated in U.S. courts if the property was "subject" *or* "*potentially subject*" to an adequate internal restitution process in its country of origin.

The United States not only set forth these general policy principles in its brief before the Supreme Court, but also explained their application to the very artwork and historical facts presented by this case. According to the United States, the Cranachs "have already been the subject of both external and internal restitution proceedings, including recent proceedings by the Netherlands in response to the Washington Principles." In the federal government's considered judgment, these proceedings were "bona fide," so their finality must be respected. Because the Cranachs were "subject (or potentially subject) to bona fide internal restitution proceedings in the Netherlands," our nation's ongoing interest in the finality of external restitution "bar[s] litigation" of the Goudstikkers' claims in U.S. courts. Simply put, the United States has clearly stated its foreign policy position that it will not be involved in adjudicating ownership disputes over the Cranachs.

## II.

The Constitution allocates power over foreign affairs exclusively to the federal government, and the power to resolve private parties' war claims is "central to the **\*729** foreign affairs power in the constitutional design." *Deutsch v. Turner Corp.,* 324 F.3d 692, 714 (9th Cir.2003). Federal foreign policy preempts Von Saher's common law claims if "there is evidence of clear conflict" between state law and the policies adopted by the federal Executive. *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 421, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003). We must determine whether, "under the circumstances," Von Saher's state law action "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of our national foreign policy concerning the resolution of World War II claims. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (internal quotation marks omitted).

### A.

In my view, Von Saher's attempt to recover the Cranachs in U.S. courts directly thwarts the central objective of U.S. foreign policy in this area: to avoid entanglement in ownership disputes over externally restituted property if the victim had an adequate opportunity to recover it in the country of origin. The majority concludes that Von Saher's claims do not conflict with federal policy because the Cranachs were never subject to any restitution proceedings in the Netherlands. As the United States explained in its amicus brief, however, the relevant issue is whether the Cranachs were subject *or potentially subject* to bona fide internal proceedings. The majority fails to acknowledge the Executive's clear determination that the Goudstikkers had an adequate opportunity to assert their claim after the war.

It is beyond dispute that the Cranachs were "potentially subject" to internal restitution proceedings in the Netherlands in the years following World War II. Desi Goudstikker could have filed a claim for the Cranachs with the Dutch government before the 1951 deadline lapsed. She chose not to do so because she believed she would not be treated fairly. As the amicus brief explained:

> In this case, Ms. Goudstikker settled with the Dutch government in 1952, and that settlement did not provide for the return of artworks like the Cranachs that had been acquired by [Hermann] Göring. When petitioner brought a Dutch restitution proceeding in 1998, the State Secretary found that "directly after the war— even under present standards—the restoration of rights was conducted carefully." Petitioner sought review of that decision in the Court of Appeals for the Hague, which found that at the time of the 1952 settlement Ms. Goudstikker "made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Göring transaction."

Thus, the only question is whether the internal restitution proceedings Desi forewent were bona fide.[1] If they were, the United States has an ongoing interest in their finality and in the finality of the Cranachs' external restitution to the Netherlands, and U.S. foreign policy expressly

bars Desi's granddaughter-in-law from reviving Desi's unasserted claim six decades later in federal district court.

The United States has determined as a matter of foreign policy that the postwar process in which Desi declined to participate was bona fide. As the United States explained in its brief, "As both the 1998 and 2004 restitution proceedings reflect, the Dutch government has afforded [Von Saher] and her predecessor adequate opportunity **\*730** to press their claims, both *after the War* and more recently." The majority concludes that this question has not been decisively determined only by finding ways to disavow the State Department's prior representations to the Supreme Court in this case.

But we lack the authority to resurrect Von Saher's claims given the expressed views of the United States. The sufficiency of the Netherlands' 1951 internal restitution process is a quintessential policy judgment committed to the discretion of the Executive. "[I]t is for the political branches, not the Judiciary, to assess practices in foreign countries and to determine national policy in light of those assessments." *Munaf v. Geren,* 553 U.S. 674, 700–01, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). Just as we may not "second-guess" the Executive's assessment that a prisoner is unlikely to be tortured if transferred to an Iraqi prison, *id.* at 702, 128 S.Ct. 2207, we may not displace the Executive's assessment that the Netherlands' postwar proceedings were adequate. For the federal courts to contradict the State Department on this issue, as is necessary to decide this appeal in Von Saher's favor, would "compromise[] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." [2] *Garamendi,* 539 U.S. at 424, 123 S.Ct. 2374 (internal quotation marks omitted).

The majority strongly suggests that the federal courts should determine the bona fides of the Netherlands' 1951 internal restitution process. It acknowledges that the Cranachs were "potentially subject to restitution proceedings" that Desi Goudstikker found unfair. It notes, however, that the Dutch government later "undermined the legitimacy of that restitution process by describing it as 'bureaucratic, cold and often even callous.' " The majority then asserts that it does not "find convincing" the United States' statement of its foreign policy because it was "presented in a brief in a different iteration of this case that raised different arguments, that involved different sources of law and that seems to have

misunderstood some of the facts essential to our resolution of this appeal."

But we are not at liberty to find that the State Department's articulation of U.S. foreign policy is not "convincing." Cf. *Zivotofsky ex rel. Zivotofsky v. Clinton,* —— U.S. ——, 132 S.Ct. 1421, 1427, 182 L.Ed.2d 423 (2012) (finding a question justiciable because "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches"). And it is immaterial whether the Executive expressed our nation's policy in a Supreme Court amicus brief concerning field preemption, a district court merits brief concerning conflict preemption, an executive agreement unconnected to any litigation, or an official's testimony before Congress. See *Garamendi,* 539 U.S. at 416, 123 S.Ct. 2374 ("[V]alid executive agreements are fit to preempt state law...."); *id.* at 421, 123 S.Ct. 2374 (quoting Ambassador Randolph M. Bell's statement of U.S. foreign policy in congressional testimony). The majority is correct that we have the discretion to defer, or not, to "the Executive Branch's view of [a] case's impact **\*731** on foreign policy." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). We have no authority, however, to decide what U.S. foreign policy is. That is the exclusive responsibility of the political branches. See *Munaf,* 553 U.S. at 700–02, 128 S.Ct. 2207. Here, the Executive has clearly expressed its policy judgment that the process in which Desi declined to participate was adequate. That should be the end of the matter.

### B.

The majority further errs by overlooking that the Cranachs were in fact subject to bona fide internal restitution proceedings in the Netherlands in 1998–99 and 2004–06.

In 1998, unaware that the Netherlands no longer possessed the Cranachs, Von Saher filed a claim to recover all of the Goudstikker artworks still in the Dutch government's possession. The State Secretary found that Von Saher's claim was untimely and declined to waive the statute of limitations because "directly after the war—even under present standards—the restoration of rights was conducted carefully." A Dutch appellate court determined it had no jurisdiction to entertain an appeal

from this decision and declined to exercise its *ex officio* authority to grant relief because Desi had "made a conscious and well considered decision" not to pursue restitution after the war.

In 2004, after the Netherlands revised its restitution policy to adopt a more equitable approach in response to the Washington Principles, Von Saher filed another claim. A governmental advisory committee recommended that the claim be granted, reasoning that the claim was "still admissible" despite the prior decisions by the State Secretary and the appellate court. The State Secretary rejected this reasoning, finding that Von Saher's "restoration of rights" had been "settled" as a legal matter and that her claim fell outside the scope of the Dutch restitution policy. The State Secretary nonetheless decided, as a matter of discretion, to return to Von Saher all of the Goudstikker artworks still in the government's possession. The Netherlands transferred to Von Saher more than two hundred of the 267 artworks she sought—but not the Cranachs, which had long ago been moved to California.[3]

The majority implausibly concludes that these were not restitution proceedings at all because Von Saher's restitution claims were time-barred and because the Cranachs were outside their scope. As an initial matter, the United States has expressly determined that the Cranachs were subject to a "1998 restitution proceeding" and a "2004 restitution proceeding" in the Netherlands, and that our nation "has a substantial interest in respecting the outcome of that nation's proceedings." This policy assessment is probably sufficient to foreclose the majority's contrary view.[4] *See* **\*732** *Munaf,* 553 U.S. at 702, 128 S.Ct. 2207. Even if it is not, Von Saher did seek "restitution" of the Cranachs, and her filing of claims and the official disposition of those claims do constitute "proceedings." *See* BLACK'S LAW DICTIONARY 1428 (9th ed.2009) (defining "restitution" as "[r]eturn or restoration of some specific thing to its rightful owner or status"); *id.* at 1324, 128 S.Ct. 2207 (defining "proceeding" as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment," or "[a]ny procedural means for seeking redress from a tribunal or agency"). That Von Saher did not succeed in obtaining her requested *relief* with respect to the Cranachs does not imply that there were no *proceedings* pertaining to the Cranachs.

Von Saher's state law claims conflict with our nation's "substantial" policy interest in respecting the finality of these two more recent rounds of Dutch proceedings. As the district court explained, these proceedings collectively determined that Von Saher was not entitled to the Cranachs' restitution as of right, but that the Cranachs should nonetheless be returned to her as a matter of discretion if the Netherlands possessed them. Put differently, Dutch authorities finally adjudicated Von Saher's legal claim to the Cranachs on the grounds that it was procedurally defaulted as a matter of Dutch law. As is routinely recognized in other contexts, allowing Von Saher to relitigate these claims in U.S. courts would necessarily undermine the finality of the Netherlands' prior proceedings. *Cf., e.g., Martinez v. Ryan,* ⸺ U.S. ⸺, 132 S.Ct. 1309, 1316, 182 L.Ed.2d 272 (2012) (noting that federal litigation concerning claims defaulted in state court undermines the finality of state adjudication). This is precisely what our nation's foreign policy requires us to avoid.

Because the Cranachs were potentially subject to restitution proceedings initiated by Desi in 1951 and actually subject to restitution proceedings initiated by Von Saher in 1998 and 2004, and because we lack the authority to invalidate the United States' policy judgment that all of these proceedings were bona fide, I would conclude that federal foreign policy preempts Von Saher's state law claims.

### III.

During their campaign of atrocities in Europe, the Nazis stole precious cultural heritage as they systematically destroyed millions of innocent human lives. Shortly after the Nazi invasion of the Netherlands in 1940, Hermann Göring expropriated a historically significant artwork from the Goudstikker family. Perhaps as restitution for earlier wrongs by another totalitarian regime, George Stroganoff–Scherbatoff later obtained the artwork from the Dutch government in 1966. An acclaimed Southern California museum then acquired the Cranachs in 1971, presumably at a substantial price. Today, they hang in the gallery of the Norton Simon without the consent of the Goudstikkers' sole heir.

Marei Von Saher and the Museum are both standing on their rights to the Cranachs. **\*733** Their dispute spans decades and continents, and it cannot be resolved in an action under the laws of California or any other U.S. state. The United States has determined, as a matter of its foreign policy, that its involvement with the Cranachs ended when it returned them to the Netherlands in 1945 and the Dutch government afforded the Goudstikkers an adequate opportunity to reclaim them. This foreign policy decision also binds the federal courts, and it should end our many years of involvement with the Cranachs as well. I would affirm the judgment of the district court.

**All Citations**

754 F.3d 712, 14 Cal. Daily Op. Serv. 6251, 2014 Daily Journal D.A.R. 7229

**Footnotes**

1    The dissent concludes that "the Cranachs were in fact subject to bona fide internal restitution proceedings in the Netherlands in 1998–99 and 2004–06." Dissent at 731; *see also* Dissent at 732 ("Von Saher did seek 'restitution' of the Cranachs, and her filing of the claims and the official disposition of those claims do constitute proceedings."). We cannot agree. In both 1998 and 2004, Von Saher sought the return of all the Goudstikker artworks the Dutch government had in its possession. This necessarily excludes the Cranachs because the Netherlands had divested itself of the panels many decades earlier. We therefore cannot conclude that Von Saher's 1998 and 2004 claims included the Cranachs.

1    The majority correctly explains the U.S. government's position that external restitution alone is not "sufficient of its own force" to bar civil litigation in U.S. courts.

2    I would not reach the question of whether Von Saher's claims are barred by the act of state doctrine because I would affirm the district court's dismissal of the complaint on the basis that her claims are preempted. I note, however, that adjudicating whether the Netherlands' 1951 proceedings were bona fide may implicate the act of state doctrine because "the outcome" of this inquiry "turns upon[ ] the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l,* 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

3    In 1961, George Stroganoff–Scherbatoff, heir to the Russian Stroganoff dynasty, filed a restitution claim for the Cranachs in the Netherlands. He asserted that the Cranachs had been wrongfully seized from his family by Soviet authorities and then unlawfully auctioned off to the Goudstikkers. The Dutch government transferred the Cranachs to Stroganoff in 1966. Von Saher alleges that these were not restitution proceedings, but simply a sale, and that the Stroganoffs never owned the Cranachs. In 1971, Stroganoff sold the Cranachs to the Norton Simon Art Foundation.

4    The majority attempts to draw an unworkable distinction between "explaining federal foreign policy" and "mak[ing] factual determinations." Our foreign policy often relies on factual assumptions inseparable from the policy itself. For instance, the federal foreign policy that "Iran's pursuit of nuclear weapons is unacceptable" entails a factual assumption that Iran is pursuing nuclear weapons. *U.S. Strategic Objectives Towards Iran: Hearing Before the S. Comm. on Foreign Relations,* 112th Cong. 7 (2011) (statement of Wendy R. Sherman, Under Secretary of State for Political Affairs). Here, the federal foreign policy that the finality of the Netherlands' prior restitution proceedings in this case should be respected entails a factual assumption that those proceedings occurred. Von Saher's attempt to plead to the contrary simply highlights why entertaining her claims would conflict with federal policy.

**End of Document**          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.